**HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS INTERNATIONAL UNION LOCAL 54 and Frank Gerace, President Hotel and Restaurant Employees and Bartenders International Union Local 54 and Frank Materio, Business Agent Hotel and Restaurant Employees and Bartenders International Union Local 54, Plaintiffs,**

v.

**Walter N. READ, Chairman, Donald Thomas, Commissioner, Carl Zeitz, Commissioner, Joel Jacobson, Commissioner, and E. Kenneth Burdge, Commissioner, Constituting the New Jersey Casino Control Commission and Thomas O'Brien, Director Department of Law and Public Safety Division of Gaming Enforcement and Department of Law and Public Safety Division of Gaming Enforcement and Thomas Kean, Governor, Defendants.**

Civ. A. No. 81–2630.

United States District Court,
D. New Jersey.

Nov. 5, 1984.

---

Bernard N. Katz, N. Michael Katz, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for Local 54 and President Frank Gerace.

Harry A. Horwitz, Davis, Reberkenny & Abramowitz, P.C., Cherry Hill, N.J., and Ronald F. Kidd, Duane, Morris & Heckscher, Philadelphia, Pa., for Frank Gerace and Frank Materio, individually.

Robert J. Genatt, John R. Zimmerman, Leonard J. DiGiacomo, New Jersey Casino Control Commission, Trenton, N.J., for New Jersey Casino Control Commission.

Irwin I. Kimmelman, Atty. Gen., of New Jersey by Anthony J. Parrillo, Asst. Atty. Gen., Gary A. Ehrlich, Eugene M. Schwartz, Mitchell A. Schwefel, Deputy Attys. Gen., Trenton, N.J., for New Jersey Division of Gaming Enforcement.

## OPINION

BROTMAN, District Judge.

For the second time in several years,[1] this court is asked to restrain application of certain provisions of the New Jersey Casino Control Act, L.1977, c. 110, § 1 et seq., as amended by L.1978, c. 7, § 1 et seq., N.J.Stat.Ann. § 5:12–1 et seq. (West Supp. 1984) ("the Act") to the Hotel and Restaurant Employees and Bartenders International Union Local 54 ("the Union"). The Union and its President, Frank Gerace, seek a preliminary injunction, damages and a declaration that the New Jersey Casino Control Commission ("the Commission") may not enforce sections 93 and 86 of the Act[2] against them. In their complaint

---

1. The court's earlier opinion in this case is reported. *Hotel & Restaurant Employees & Bartenders International Union Local 54 v. Danziger,* 536 F.Supp. 317 (D.N.J.1982).

2. As this court noted in its earlier opinion,

Section 93 of the Act, N.J.Stat.Ann. § 5:12–93 (West Supp.1981), prohibits labor organizations representing employees of casinos and casino hotels from collecting dues from those employees, or from administering pension

plaintiffs challenge two orders by the Commission, the first of which issued on September 28, 1982 and disqualified Frank Gerace and two others as officers of the Union, and the second of which issued on September 12, 1984 and directed the Union to remove the three individuals from their positions as Union officers. Plaintiffs' amended complaint asserts claims based on the federal labor laws, causes of action under the due process clauses of the Fifth and Fourteenth Amendments, various claims under the First and Fourteenth Amendments and a claim based on 42 U.S.C. § 1983. For the purposes of this motion, plaintiffs allege only that the qualification requirements of Section 86(f) of the Act, as applied to two of the Union's officers, violate the First, Fifth and Fourteenth Amendments.

The defendants in this action include the Casino Control Commission, the chairman and other members of the Commission, the New Jersey Division of Gaming Enforcement ("the Division"),[3] the director of the Division and the Governor of the State of New Jersey. Frank Gerace, Frank Materio and Karlos LaSane, the three union officers facing the removal sanction, have petitioned to intervene in this action as plaintiffs in their individual capacity. The inter-

venor-applicants propose to challenge the validity of section 86(f) of the Act as applied and on its face, on the ground that it violates First Amendment guarantees of freedom of association. The intervenor-applicants also seek to assert claims that section 86(f) is impermissibly vague, in violation of the First, Fifth and Fourteenth Amendments.

## I. *Procedural History*

The history of this litigation is complex. At various times, the case has involved proceedings before the federal courts, the state courts and the Commission, a state regulatory agency. This matter originated with recommendations by the Division of Gaming Enforcement to the Commission to hold hearings as to the Union's compliance with sections 93 and 86 of the Act.[4] The Union and its President then presented this court with a motion for injunctive and declaratory relief in which plaintiffs sought an order prohibiting the Commission from conducting hearings as to the qualifications of Gerace and others to serve as officers of the Union. Plaintiffs argued that sections 93 and 86 of the Act were preempted by the federal labor laws and in violation of the First, Fifth and Fourteenth Amend-

and welfare funds, unless the union has registered with the Casino Control Commission and the union's officers, agents and key employees have met certain qualifications delineated in § 86 of the Act. N.J.Stat.Ann. § 5:12–86 (West Supp.1981).
536 F.Supp. at 320.

3. This court previously explained the role of the Commission and the Division within the regulatory scheme set forth in the Casino Control Act:
Pursuant to the power granted it by the Constitution of the State of New Jersey, N.J. Stat.Ann. Const. Article 4, § 7, ¶ 2 D (West Supp.1981), the New Jersey Legislature enacted the Casino Control Act, *supra* in 1977, establishing the conditions under which casino gambling in Atlantic City would be conducted and controlled. The Act establishes the Casino Control Commission in the Department of Treasury, N.J.Stat.Ann. § 5:12–5 (West Supp.1981), and the Division of Gaming Enforcement in the Department of Law and Public Safety. N.J.Stat.Ann. § 5:12–55 (West Supp.1981). The Casino Control Commission is charged with the duties of passing on appli-

cations for licenses, N.J.Stat.Ann. §§ 5:12–63 and –64 (West Supp.1981), and the Division of Gaming Enforcement is empowered to investigate the qualifications of applicants for licenses, and to present its views on such applications to the Commission. N.J.Stat.Ann. §§ 5:76 through –79 (West Supp.1981).
536 F.Supp. at 321.

4. The court's findings of fact in its prior opinion described the events leading up to plaintiffs' original petition for relief:
3. Local 54 filed its annual registration statement as required by the Casino Control Act in 1978. On May 12, 1981, the defendant Division of Gaming Enforcement, following its investigation of the applicant, stated its objections to the application.
4. The Casino Control Commission thereupon ordered that hearings on the subject of Local 54's registration commence on September 9, 1981.
536 F.Supp. at 324 (citations omitted).

ments to the United States Constitution.[5] The court denied plaintiffs' motion. *Hotel & Restaurant Employees & Bartenders International Union Local 54 v. Danziger,* 536 F.Supp. 317 (D.N.J.1982).

Plaintiffs appealed this court's ruling and then sought a stay pending the outcome of the appeal, pursuant to Fed.R.App. P. 8(a). Initially, they were turned down by this court and the Court of Appeals. As a result, the Commission proceeded with disqualification hearings. Subsequently, the commission declared Frank Gerace, Frank Materio and Karlos LaSane to be disqualified as officers of the Union and decided to bar the Union from collecting dues from its members unless the three individuals left their posts. Plaintiffs returned to this court for a stay of the sanctions imposed by the Commission and received such relief from the court pending resolution of their appeal.[6]

The Court of Appeals ruled that the federal labor laws, in particular section 7 of the National Labor Relations Act ("NLRA") and section 504 of the Labor Management Reporting and Disclosure Act ("LMRDA"), preempt the field of regulation of qualification of union officials. *Hotel & Restaurant Employees & Bartenders International Union Local 54 v. Danziger,* 709 F.2d 815 (3rd Cir.1983). Accordingly, the court remanded the case for "entry of an order enjoining the Commission and the Division from taking any action, pending final hearing, to enforce section 93 against the casino." 709 F.2d at 833. Having resolved the appeal on federal statutory grounds, the court found it unnecessary to reach plaintiffs' constitutional claims based on vagueness and overbreadth. *Id.*

The same issues of federal preemption received a different treatment on review in the Supreme Court. *Brown v. Hotel & Restaurant Employees & Bartenders International Union Local 54,* — U.S. —, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984). Justice O'Connor, speaking for the majority, held that section 7 of the National Labor Relations Act "does not preclude ... imposition of qualification standards on casino industry union officials." The Court de-

**5.** The initial complaint in this action stated claims as follows:

> that application of the Act against the plaintiffs is preempted by the National Labor Relations Act of 1935, *infra,* the Labor-Management Reporting and Disclosure Act of 1959, *infra,* and that the Act is thereby invalidated under the Supremacy Clause of the Constitution. U.S.C.A. Const. Art. VI, cl. 2 (West 1963). Plaintiffs also plead that the Act is vague and overbroad, that it is invalid under the First and Fourteenth Amendments and under the Contract Clause. U.S.C.A. Const. Art. I, § 10 (West 1968).
> 536 F.Supp. at 321.

**6.** The Third Circuit opinion in this action provides a full account of these procedural developments:

> Because no preliminary injunction was entered [by the U.S. District Court] the Commission went forward with a disqualification hearing. Its subsequent actions were called to the attention of the district court in a motion, pursuant to Fed.R.Civ.P. 62(c), for reconsideration of the issuance of an injunction pending this appeal. On September 28, 1982 the Commission issued an opinion in which it found that President Frank Gerace, Executive Board member Frank Materio and Business Agent Karlos LaSane were disqualified under the criteria of section 86. Gerace and Materio were held to be disqualified under section 86(f) because they were associated with members of organized crime in a manner inimical to the policy of the Act and to gaming operations. LaSane was disqualified under section 86(c) because he had been convicted in 1973 of extortion from persons doing business with Atlantic City while he was a City Commissioner. The Commission concluded that the Union should be barred from collecting dues from its members employed in the casino industry. [Upon application by plaintiffs under Fed.R.Civ.P. 60(b),] the district court ordered that the Commission be enjoined, pending this appeal, from taking any steps to enforce section 93 or its September 28, 1982 decision. That order did not prohibit the Commission from rendering an opinion interpreting section 93(b) with respect to the Union's administration of pension and welfare funds. On October 12, 1982 the Commission issued an opinion holding that the dues collection prohibition and the welfare fund prohibition could be applied singly or jointly, but that in this instance it would not invoke the latter sanction.
> *Hotel & Restaurant Employees & Bartenders International Union Local 54 v. Danziger,* 709 F.2d 815, 820–21 (3rd Cir.1983).

clined to decide, in the absence of a fully developed factual record, whether the specific sanctions imposed by the Commission are permissible.[7] The Court noted that

> even a finding that § 7 prohibits imposition of the dues collection sanction need not imply that New Jersey's disqualification standards are not otherwise enforceable by the Commission. The Act, for example, apparently grants broad powers to the Commission to impose sanctions directly on disqualified persons and to limit or restrict a labor organization's registration. *See* N.J.Stat.Ann. § 5:12–64 (Supp.1983–1984).[8]

In its instructions to the court below, the Supreme Court ordered this court to consider on remand the factual issue of whether a dues collection ban would seriously conflict with the Union's "statutory functions as bargaining representative." 104 S.Ct. at 3192.

Since the Supreme Court announced its decision in June 1984, the Commission has taken several steps which have altered the posture of the case before this court. First, in its order of September 12, 1984, effective September 28, 1984 ("the 1984 Order"), the Commission withdrew its decision to impose the dues collection sanction. Second, the Commission chose to employ another sanction; that is, it ordered the Union to remove Gerace, Materio and LaSane from their positions. Commission' Brief in Opposition to Application for a Temporary Restraining Order at 7; Appendix to Brief in Opposition at A2–A3, citing transcript of the Commission's 1984 Order.

Plaintiffs have again invoked the jurisdiction of this court after the intervenor-applicants exhausted their opportunities to obtain a stay of the Commission's 1984 Order in the state courts. On September 26, 1984, Judge Robert A. Matthews of the New Jersey Superior Court, Appellate Division, granted a stay of the Commission's 1984 Order as to Frank Gerace and Frank Materio. A stay was denied as to Karlos LaSane. Brief of Commission, Appendix at 10. On October 5, 1984, the Supreme Court of New Jersey dissolved the stay as to Gerace and Materio and denied an application for a stay by LaSane. Commission's Brief in Opposition to Application a Preliminary Injunction, Appendix at A2–A3.

Coincident with the proceedings concerning requests for relief pendente lite, plaintiffs and intervenor-applicants filed pleadings with the Appellate Division appealing the Commission's 1984 Order. Plaintiffs have raised the same claims presented to this court as well as a facial challenge to section 86(f) of the Act on grounds of overbreadth. In addition, plaintiffs have raised the following two claims under state law, according to their notice of appeal: that the Commission lacks authority under section 86(f) "to issue an Order directing labor union officials to vacate their offices"; and that the Commission committed "reversible error by refusing to hear additional testimony" prior to entering its 1984 Order. Defendants' Exhibit 1. According to the intervenor-applicants' notice of appeal, they are alleging the same federal claims presented to this court, the two state claims raised by plaintiffs and two other

---

**7.** The Court majority also did not reach the question of the validity of the other sanction considered by the Commission, prohibition of the Union's administration of its welfare or pension funds. Because the Commission declined to invoke the sanction, the Court considered the issue "not ripe for review." 104 S.Ct. at 3192; *see supra*, n. 6.

**8.** With respect to the Commission's power to impose other sanctions, the decision went on to state that

> The Act also provides that the Commission "may exercise any proper power or authority necessary to perform the duties assigned to it

by law," and that "no specific enumeration of powers in this act shall be read to limit the authority of the commission to administer this Act." § 5:12–75. The Commission itself has implicitly construed the Act as granting it the statutory authority to fashion different and less severe sanctions than those expressly enumerated in § 93(b). *See* App. to Juris. Statements 206a; 536 F.Supp., at 330. If the Commission has correctly interpreted state law, an issue we of course do not decide, it could then enforce § 93(b)'s disqualification criteria by numerous other means. 104 S.Ct. at 3191.

issues of state law: whether the Commission misconstrued section 86(f) in finding the Union officers disqualified; and whether the Commission had sufficient evidence to find the Union officers disqualified under section 86(f). Defendants' Exhibit 2.

Both the Union and Frank Gerace challenged the Commission's Order of September 28, 1982 ("the 1982 Order") in the Superior Court of New Jersey, Appellate Division. When the Third Circuit issued its decision staying the 1982 Order and invalidating sections 93(a) and 93(b), the Union and Gerace petitioned the Appellate Division to stay its proceedings in this matter, or, in the alternative, to dismiss the pending appeal without prejudice. On July 8, 1983, the Appellate Division denied the motions for a stay and dismissed the appeals without prejudice. The Union and the intervenor-applicants have recently requested the Appellate Division to reinstate their appeals of the Commission's 1982 Order and to consolidate them with those recently filed by them challenging the Commission's 1984 Order. As of the date of this opinion, the Appellate Division has not yet ruled on these motions.

## II. *Jurisdiction*

The plaintiffs' allegations asserting denial of their rights guaranteed by the First, Fifth and Fourteenth Amendments properly invoke this court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (West Supp. 1984). The individuals applying to intervene also predicate jurisdiction on the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to the extent that they seek a declaration that section 86(f) of the Casino Control Act is facially invalid.

Defendants challenge the authority of the court to consider the merits of this motion on several grounds. Initially, the Division asserts that the Union lacks standing to challenge section 86(f) of the Act as applied to Gerace and Materio. According

to the Division, no cognizable injury has been suffered by the Union due to the disqualification of its officers and it is inappropriate for the court to permit the Union to seek redress for injuries to third parties independently represented by counsel.

Next, the Commission and the Division contend that the court should abstain from rendering a decision in this matter on either of two grounds.[9] Defendants urge the court to dismiss the instant motion on the basis of the doctrine established by *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which limits the authority of the federal judiciary to enjoin state administrative and judicial proceedings. In the alternative, defendants request the court to stay its hand pending resolution of outstanding state law questions now on appeal in state court. This position is founded on the principles expressed in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). As this court explained in its earlier opinion, the major premises of *Pullman* abstention is the notion that the state courts should

have the opportunity to construe the Casino Control Act in a way which might obviate the necessity for a decision of the constitutional issue[s facing the court.]

536 F.Supp. at 325. Under *Pullman*, the court would retain jurisdiction over all constitutional claims asserted in this case.

In the event that the court determines that it has the power to decide this case, defendants claim that the court is nevertheless barred from granting this motion for preliminary injunctive relief on grounds of res judicata and collateral estoppel. Defendants contend that this motion presents issues previously decided by the Supreme Court of New Jersey, and that "collateral review" or "relitigation" of such matters is impermissible.

---

9. The Union argued in its brief and oral presentation that defendants waived the abstention issue in their argument before the Supreme Court. The court finds this objection without merit. The abstention question arises in a dif-

ferent context at this stage as different issues of federal law are involved. In any event, the court notes that the Commission reserved the abstention argument in its Supreme Court brief.

The court recognizes that a decision in favor of defendants on the issues of standing or *Younger* abstention would result in dismissal of plaintiffs' complaint and obviate the need to consider the motion to intervene. Thus the court will proceed to rule on these matters before discussing the intervention motion.[10]

### a. Standing

■ There is no dispute that individual officers of the Union have standing to contest the Commission's order directing their removal from positions within the Union. The same actions by the Commission, however, are alleged to be an insufficient basis for a cause of action by the Union itself. According to the Division of Gaming Enforcement, the Union and its membership have no right to be led by specific persons regardless of the circumstances. The Division implies that the Union would thus suffer no legally cognizable injury as a result of the removal of Gerace and Materio. The Division argues that the Union is also an improper party to raise claims for Gerace and Materio, based on a theory of third-party standing, because the two individuals have independent counsel.

Such arguments have a superficial appeal, but upon closer review, they are without substance. The Division is correct that the Supreme Court declared in its opinion in this case that the states may impose certain qualification requirements which limit the right of unions to select particular persons for leadership positions. However, the fact that a right is qualified rather than absolute does not eliminate a party's capacity to challenge unlawful restrictions of that right. Generally, it is clear that both the membership and the institutional structure of a union suffers some injury when its elected officers cease to perform their assigned duties. In this case, where the Union is the object of the order directing removal of Gerace and Materio, the challenged actions plainly have a direct impact on the Union itself. The court finds that the Union and its President allege a threatened injury distinct from that which is alleged by Gerace, Materio and LaSane as individuals. Consequently, the court finds without merit and need not address the Division's objections concerning the Union's possible claims to third-party standing.

### b. Younger Abstention

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court announced a rule of equitable restraint with respect to federal court intervention in state criminal prosecutions. Justice Black based his majority opinion on the notion of "comity." He declared that respect for the role of the state governments in the federal system requires federal courts to refrain from enjoining state criminal proceedings absent "special circumstances." 401 U.S. at 43–45, 91 S.Ct. at 750–751. *See generally* 17 Wright, Miller & Cooper, Federal Practice and Procedure §§ 4251–4255 (1983 ed.); *Johnson v. Kelly,* 583 F.2d 1242, 1245–46 (3rd Cir. 1978). The *Younger* doctrine has been extended to certain state civil proceedings, both judicial and administrative. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (civil counterpart to *Younger* created); *Williams v. Red Bank Board of Education,* 662 F.2d 1008, 1014–17 (3rd Cir.1981) (applicability of *Younger* to some state administrative proceedings). Although *Younger* has been applied in many contexts to bar federal intervention in state administrative enforcement proceedings, strict limits on the *Younger* doctrine remain.

The initial task defendants face in urging application of *Younger* is to convince this court to deviate from its analysis earlier in this case rejecting such a result. When first faced with this issue, the court stated that

**10.** The court heard argument and received briefs on these matters from plaintiffs as well as the intervenor-applicants.

The rule which restricts the federal courts' power to enjoin state proceedings is applicable only to those proceedings which are initiated by the state. *Johnson v. Kelly*, 583 F.2d 1242, 1247, 1249 (3rd Cir.1978); *Bally Manufacturing Corp. v. Casino Control Commission*, 534 F.Supp. 1213, 1218–20 (D.N.J.1982); *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 145 (E.D.Pa.1977). It is recognized that on this motion the plaintiffs seek to restrain the hearings which were, in fact, scheduled at the instance of the Casino Control Commission. Nevertheless, the entire registration procedure is one which is initiated by the applicant, and it is the validity of the entire procedure which is in question in this case. 536 F.Supp. at 325. In support of their contention that the court's prior ruling on *Younger* abstention is not controlling, defendants argue that the Court of Appeals rejected the court's reasoning while sustaining the court's decision not to abstain. Defendants appear to concede that this action is not "state-initiated"; however, they allege that changes in the procedural posture of this case now demand a different result in light of the Third Circuit's different view of *Younger* abstention. Defendants further note that the validity of the Commission disqualification proceedings are no longer in doubt after the Supreme Court's ruling and that plaintiffs' claims are now being considered in state court. Consequently, they argue, the way is clear for this court to abstain under *Younger.*

The Third Circuit panel in this case was unanimous in upholding the court's decision not to invoke *Younger.* Neither opinion discussed the concept of "state initiation." The majority and minority opinions differed substantially in their treatment of the question. An understanding of these differences is essential to an evaluation of the effect of the circuit court's ruling on this court's "state initiation" analysis.

Judge Gibbons, writing for himself and Judge Higginbotham, stated that in spite of *Younger,* the federal courts have the power to intervene in state agency proceedings which implicate federal preemption interests such as maintenance of rights guaranteed by the federal labor laws. 709 F.2d at 832–833. He concluded that various decisions interpreting *Younger* in the context of labor relations

> suggest that when the issue tendered to a federal district court is the very power, as a matter of federal law, to entertain a threatened proceeding, the principles of comity and federalism which apparently animate the *Younger v. Harris* rule are totally inapplicable. Certainly we cannot hold that the district court committed an abuse of discretion in holding a hearing on the Union's motion for a preliminary injunction.

709 F.2d at 833. This portion of the majority opinion followed the court's detailed discussion of preemption and preceded the court's brief explanation that its holding on the issue of preemption made it unnecessary to reach plaintiffs' First Amendment claims. *Id.*

The majority's silence on the "state initiation" issue and its focus on the validity of the Commission's proceedings both seem to follow from the court's great attention to preemption. The absence of any discussion of the district court's treatment of *Younger* may also reflect a view on the part of the majority that *Younger* did not pose a serious barrier to its power to review the case. By contrast, this court's prior opinion considered *Younger* abstention as a threshold question to be decided in light of all claims raised by the plaintiffs. Contrary to defendants' assertions, there is no evidence that the majority implicitly rejected the district court's "state initiation" rationale, and there is every indication that the circuit did not reach the issue because of other compelling reasons not to apply *Younger.*

Defendants also refer to certain passages concerning *Younger* in the concurring opinion of the Third Circuit as support for its theory that the appellate court rejected the "state initiation" rule. In his separate opinion, Judge Becker agreed with the majority that the determinative

issue with regard to *Younger* abstention was that "the proceedings themselves constitute a violation of a constitutional right." 709 F.2d at 835, n. 3. Furthermore, he stated this was a close case which at "first blush" seemed proper for abstention. *Younger* was superseded only because "applicants' federal claims simply cannot be vindicated in state court." *Id.*

Like the majority opinion, Judge Becker's opinion concentrates on abstention in the context of preemption and does not explicitly reject the "state initiation" rationale. Furthermore, Judge Becker disagreed with the majority's interpretation of *Younger* in many respects. In particular, he did not consider *Younger* "totally inapplicable." At most, Judge Becker's opinion, well-reasoned as it was, is a minority view on the question of "state initiation" as it applies to *Younger* abstention. It is far more likely that Judge Becker's decision is consistent with the "state initiation" rationale, because one of the cases cited in his discussion of *Younger* supports the "state initiation" rule. *Williams v. Red Bank Board of Education*, 662 F.2d 1008 (3rd Cir.1981). The *Williams* court rejected an invitation to erode the "state initiation" doctrine. 662 F.2d at 1019–20.

The "state initiation" rule was first enunciated as the law of this circuit in *Johnson v. Kelly*, 583 F.2d 1242 (3rd Cir.1978), and has been consistently applied since then. *Williams*, *supra; Kennecott Corp. v. Smith*, 637 F.2d 181, 186, n. 4 (3rd Cir. 1980). The same rule has been followed in at least two other circuits.[11]

Finally, defendants argue that the court should reconsider its characterization of the state agency proceedings in this case as not "state initiated." The court rejects this suggestion based on another of its opinions which set forth in detail the rationale behind the finding that Casino Control Commission enforcement proceedings against casino industry registrants are *not* "state initiated" for *Younger* purposes. *Bally*

*Mfg. Corp. v. Casino Control Commission*, 534 F.Supp. 1213, 1218–20 (D.N.J. 1982). In light of the uninterrupted application of the "state initiation" rule as a bar to *Younger* abstention in this circuit, the court believes it would be unwarranted to read into the Third Circuit decision an implicit rejection of the "state initiation" rule.

■ In short, nothing has changed in this case to alter the fact that the absence of state initiation of the proceedings sought to be enjoined bars application of *Younger*. Accordingly, the motion will not be dismissed under the *Younger* doctrine.

Having decided that this action will not be dismissed, and before proceeding to consider other issues concerning the subject matter properly presented for review, the court now turns to the motion to intervene.

### c. Motion to Intervene

Frank Gerace, Frank Materio and Karlos LaSane request leave to intervene in this action as plaintiffs in their individual capacity, pursuant to Fed.R.Civ.P. 24(a) and 24(b). These applicants allege that their claims arise out of the same circumstances on which the claims of the plaintiffs are based, and involve common questions of law and fact. Defendants do not contest these allegations of the application to intervene and have not offered any reason to believe that such intervention would delay these proceedings or prejudice the rights of the present parties. However, the defendants argue that the motion to intervene is untimely as the three officers until now have pursued their claims only in the state courts. Defendants characterize the motion to intervene as "forum shopping" designed to defeat the adverse rulings of state courts.

■ The issues at stake in this litigation have shifted somewhat since the decision of the Supreme Court. In particular the Commission's 1984 Order has directed the focus of enforcement of the Act away from the

---

**11.** Before *Johnson,* several other circuits established the same rule. *Ealy v. Littlejohn,* 569 F.2d 219, 233 (5th Cir.1978); *Puerto Rico Inter-* *national Airlines, Inc. v. Recio,* 520 F.2d 1342, 1345 (1st Cir.1975).

Union in general and toward the three Union officers themselves. The court finds that these developments amply justify the intervention of the individual officers at this time. In addition, the court finds that the presence of counsel for the individual officers will help to clarify any divergence between the interests of the officers and of the Union itself. Accordingly, the court will grant the motion to intervene as to Frank Gerace and Frank Materio in the interest of fairness to these individuals and because of the court's interest in thorough treatment of the issues. The court will deny the motion to intervene as to Karlos LaSane. Mr. LaSane challenges the Commission's actions pursuant to section 86(c) of the Act rather than section 86(f). Thus his claims do not give rise to the same issues of law and fact as do those of Gerace and Materio.

Plaintiffs now seek preliminary relief from the Commission's actions by challenging section 86(f) as applied to Gerace and Materio.[12] The intervenor-applicants seek to raise similar claims as well as several facial challenges to section 86(f) of the Act. This court in its earlier decision has already rejected claims that section 86(f) is vague and overbroad on its face, when those claims were raised by the plaintiff. 536 F.Supp. at 333–38. The court is concerned that permitting intervention as to these issues will unduly complicate this matter and invite relitigation of questions previously resolved by this court. The essence of this lawsuit at this stage is the application of the statute to Gerace and Materio. Consequently, the court will limit the inter-

vention of Gerace and Materio to their cause of action attacking section 86(f) *as applied* (emphasis supplied), and restrict them from raising facial challenges to the Act in connection with this motion. As noted above, such issues have been previously resolved and are not properly before the court at this time.

### d. Pullman Abstention

The court is urged to decline exercise of its jurisdiction in accordance with *Pullman, supra*. In this regard, defendants note that the appeals filed in state court by plaintiffs contain several questions of state law involving interpretation and application of the Casino Control Act. Defendants contend that the state courts could resolve these issues by construing the Act in such a manner as to obviate the need to address the federal constitutional claims presented.

■■■ Under *Pullman*, the district court stays its proceedings pending a final determination of state law questions by the state courts. *American Trial Lawyers Association v. New Jersey Supreme Court*, 409 U.S. 467, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973). Plaintiffs are entitled to reserve the right to have their federal claims heard in this court in the event that the state tribunals are unable to dispose of the case under state law. In order to do so, plaintiffs must express a desire to have their constitutional claims decided in federal court.[13] *England v. La. State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

**12.** In their complaints and briefs, counsel for the plaintiffs only presented "as applied" claims of infringement of associational freedoms. At oral argument, however, counsel in addition contended that the Act is unconstitutionally vague as applied to Gerace and Materio. The court deems both "as applied" challenges to be before it.

**13.** In *England* the Supreme Court observed that:

There are fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept

instead a state court's determination of those claims.

375 U.S. at 415, 84 S.Ct. at 464. The Court went on to say that a party foregoes this right only when he "freely and without reservation submits his federal claims for decision by the state courts...." To preserve the right, the federal plaintiff should notify the state tribunal of his reservation of federal claims to "inform those courts what his federal claims are, so that the state statute may be construed 'in light of' those claims." *Bally Mfg. Corp., supra,* 534 F.Supp. at 1216, quoting *England,* 375 U.S. at 419, 420, 84 S.Ct. at 466, 467.

The doctrine of *Pullman* is based on two important policies. First, *Pullman* serves to avoid unnecessary constitutional adjudication. All of the claims presented by plaintiffs and the applicants to intervene in this motion involve federal constitutional questions. Meanwhile, in their state court appeals, both the Union and the individual officers are also pressing state statutory claims. Second, by giving state courts an opportunity to construe state statutes so as to avoid constitutional infirmities, *Pullman* abstention may help to avoid "needless friction between federal pronouncements and state policies." *D'Iorio v. County of Delaware*, 592 F.2d 681, 685 (3d Cir.1978).

Previously, the court has indicated that *Pullman* should be applied with caution to claims that a state statute infringes freedoms guaranteed by the First Amendment. Such rights are so important that in some cases it may be inappropriate to risk delaying their vindication in order to afford state tribunals the opportunity to act as primary arbiters of complex questions of state law. 536 F.Supp. at 334.

Earlier in this case, the court ruled *Pullman* abstention to be improper with respect to plaintiffs' facial challenge to the Casino Control Act on grounds of vagueness and overbreadth; however, the court noted that deference to the state courts might be advisable under other circumstances.

> It has already been stated that the challenge to the statute is at this point a facial one, based on the assertion that §§ 93 and 86 are invalid in their application to labor unions under any circumstances. Were the court presented with a challenge to a specific application of these provisions, the question of whether to abstain might be differently decided.

536 F.Supp. at 334. The court now finds itself in such a situation.

The court is urged to reconsider its position that *Pullman* abstention may be appropriate in cases involving First Amendment questions arising out of a specific application of a state statute. According to the individual plaintiffs, *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) declares abstention inappropriate for cases in which statutes are alleged to violate the First Amendment either on their face *or as applied*. 380 U.S. at 489–90, 85 S.Ct. at 1122–23.

Plaintiffs' argument mischaracterizes *Dombrowski*, which involved enforcement of a state criminal statute designed to control "subversives." The complaint in *Dombrowski* included a facial challenge alleging the statute was void for vagueness and had been applied in bad faith in order to discourage political activity protected by the First Amendment. The Court held that each of these two aspects of the case constituted "special circumstances" justifying intervention in state criminal proceedings. 380 U.S. at 489–90, 85 S.Ct. at 1122–23. In general, however, *Dombrowski* reaffirmed policies of judicial restraint in the exercise of equitable power, particularly in instances of a state's "good faith administration" of its law (here, criminal laws). *Id.* at 484–85, 85 S.Ct. at 1119–20. Plainly, the Court did not rule abstention inappropriate in all or most circumstances involving "as applied" First Amendment challenges to state statutes.

On several occasions since *Dombrowski*, the Supreme Court has recognized that the policies of *Pullman* may be served by deference to the state courts in cases involving First Amendment claims alleging a statute is void for vagueness as applied. *Procunier v. Martinez*, 416 U.S. 396, 401, n. 5, 94 S.Ct. 1800, 1805–06, n. 5, 40 L.Ed.2d 224 (1974); *Cameron v. Johnson*, 390 U.S. 611, 621–23, 88 S.Ct. 1335, 1340–42, 20 L.Ed.2d 182 (1968). Plaintiffs have pursued such a claim before this court, and they have raised such a question before the state courts. *See supra*, at 1441, n. 12; *infra*, at 1443–1444. Thus *Procunier* and *Cameron* support an exercise of abstention in this instance.

In this circuit, there are three prerequisites for application of *Pullman*.

First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal

court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law by the federal court would be disruptive of important state policies. In addressing an abstention claim, a district court must first consider whether the particular case falls within the ambit of *Pullman* as defined by these criteria, and must then make a discretionary determination, based on the weight of these criteria and other relevant factors, as to whether abstention is in fact appropriate. *D'Iorio, supra,* at 686. Among the issues relevant to such a "discretionary determination" are the length of time the case has been in litigation and the presence or absence of on-going litigation in the case in state court. Wright, Miller & Cooper, *supra,* § 4242, pp. 468–70. The court will now review, in turn, each of these issues.

### 1. Uncertainty of State Law

Two issues raised by plaintiffs before the Superior Court of New Jersey, Appellate Division, appear to present difficult questions of state law. The first of these claims is that the Commission lacked authority under section 86(f) of the Casino Control Act to issue its 1984 Order directing officials of the Union to vacate their offices. The Supreme Court itself has referred to the scope of the Commission's enforcement powers as a cloudy issue of New Jersey state law. In her opinion for the majority in this case, Justice O'Connor acknowledged that the Commission had construed the Act to afford itself leeway to "fashion different and less severe sanctions than those expressly enumerated in § 93(b)." She surmised that section 75 of the Act might constitute a statutory basis for such an interpretation, but declined to express an opinion on the matter. 104 S.Ct. at 3191; *see supra,* n. 8.

Individual plaintiffs Gerace and Materio pose two related state questions which are unclear: whether the Commission miscon-

strued section 86(f) in finding the two officers disqualified; and whether the Commission had sufficient evidence to find them disqualified under the Act. Together these questions highlight the uncertain scope and content of the prohibitions applied to Gerace and Materio. Under the Act, disqualification is appropriate on the basis of "identification ... as ... an associate of a career offender ... in such a manner which creates a reasonable belief that the association is of such nature as to be inimical to the policy of this act and to gaming operations." N.J.Stat.Ann. § 5:12–86(f).

The other state law issue raised in the plaintiffs' 1984 state court appeals concerns a routine question of administrative law which provides no basis for abstention. According to the Union, the Commission's refusal to hear testimony from Frank Gerace before issuing its 1984 Order constituted reversible error. Scrutiny of the Commission's decision to proceed without Gerace's testimony requires an evaluation of an exercise of agency discretion. Such a determination should be relatively straightforward in light of the prevailing standard of review.

### 2. Effect of State Law on Plaintiffs' Federal Claims

■ For purposes of *Pullman* abstention, it is necessary to show that the statute in question is "fairly susceptible" to an interpretation that would avoid the need for constitutional adjudication or that would substantially modify the constitutional question. *Bellotti v. Baird,* 428 U.S. 132, 147–48, 96 S.Ct. 2857, 2866–67, 49 L.Ed.2d 844 (1976); *Harman v. Forssenius,* 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965); Wright, Miller & Cooper, *supra,* § 4242, p. 460. The state law claims raised by the individual plaintiffs concerning the scope of section 86(f) provide the New Jersey state courts with an opportunity to narrow or render moot the plaintiffs' federal claims.

Plaintiffs' freedom of association claim turns on the theory that it is impermissible to regulate social contacts between labor

union officials and other private citizens which do not evidence an intent to engage in or an actual involvement in unlawful conduct. An interpretation of the Act consistent with that standard of proof is possible and would obviate review of plaintiffs' claim. A construction of the Act establishing a lesser standard for disqualification or defining specific kinds of evidence necessary to demonstrate "inimical" associations would substantially narrow the First Amendment issue raised by the Union and the individual plaintiffs.

Plaintiffs' "as applied" challenge on grounds of vagueness is also predicated on the lack of official guidance available to the Union and the individual plaintiffs as to the meaning of section 86(f). Plaintiffs contend that the term "inimical" failed to indicate to them whether certain of their associations are barred by the Act. They argue that section 86(f) appears to disqualify them for contacts with Nicodemo Scarfo before he received the designation as a "career criminal." In both instances, the state courts could focus or obviate review of these constitutional claims through a narrowing construction of the Act. It seems plausible that the legislature had specific ideas as to the nature of "inimical" associations; it also seems reasonably possible that the legislature may have intended to delegate to the Commission the task of defining the term. Likewise, section 86(f) seems fairly susceptible to an interpretation either barring or permitting disqualification for past associations with persons subsequently found to be "career criminals" by the Commission. In short, because this case

> turns on the applicability of a state statute or regulation to a particular person or a defined course of conduct, resolution of the unsettled question of state law may eliminate any need for constitutional adjudication....

. . . . .

Abstention is therefore appropriate. *Procunier v. Martinez,* 416 U.S. 396, 401, n. 5, 94 S.Ct. 1800, 1805, n. 5, 40 L.Ed.2d 224 (1974), quoting *Baggett v. Bullitt,* 377

U.S. 360, 376–77, 84 S.Ct. 1316, 1325–26, 12 L.Ed.2d 377 (1964), cited in Wright, Miller & Cooper, *supra,* § 4242, p. 461. By contrast, this is not a case where

> the statute or regulation is challenged as vague because individuals to whom it plainly applies simply cannot understand what is required of them and do not wish to forswear all activity arguably within the scope of the vague terms.

In such circumstances abstention is not required. *Id.*

On its own, the claim that the Commission had insufficient evidence to disqualify Gerace also offers another plausible basis upon which the constitutional issues in this case may be avoided.

The plaintiffs' state claims concerning the validity of the removal sanction does not provide an independent basis for *Pullman* abstention. Although resolution of this issue might alter the facts underlying the constitutional questions ultimately presented by this court, it would not affect the nature of those questions. So long as the state courts identify some sanctions available to the Commission which it then chooses to impose, such enforcement implicates the same substantive constitutional rights to associate freely and to receive notice of proscribed conduct in accordance with due process.

### 3. Effect of Erroneous Federal Court Decision on Important State Policies

There can be no doubt that an unnecessarily broad ruling by this court based on plaintiffs' constitutional claims and occasioned by the court's failure to abstain would severely affect important state interests. To delay or limit enforcement of the Commission's orders as to the plaintiffs when such a result may be obviated by a narrowing construction of the Casino Control Act would have a serious negative impact on New Jersey's strong interest in strict regulation of the casino gambling industry. The reasons for New Jersey's intense efforts to supervise casino gambling so as to avoid potential influence by

organized crime are described in detail in this court's prior opinion. 536 F.Supp. at 321-24.

### 4. Other Relevant Factors

Having found the three prerequisites for *Pullman* abstention to be satisfied, the court now considers other factors relevant to its discretionary determination as to the appropriateness of abstention in this case. The court notes that the state law issues discussed above have already been posed to the state courts. Consequently, abstention would not necessarily result in delays in adjudication of this matter; nor is there any "significant doubt about the existence of adequate means to determine the unclear state issues." Wright, Miller & Cooper, *supra*, § 4242, p. 469. Although the length of this litigation might weigh against abstention under different circumstances, *id.*, it does not in this case, in which plaintiffs have benefited from judicial stays of the Commission's orders for over two years.

 In light of all the factors discussed above, the court finds abstention to be the appropriate course in this case. The dangers of prejudicial delay appear to be balanced by the possibility that deference to the state courts may produce an equally speedy result at a lesser cost to the state's interest in strict regulation of the casino industry. In this case, *Pullman* abstention may serve important goals of state policy, and will certainly further the values of comity and federalism underlying the doctrine. These considerations cause the court to exercise its discretion in favor of abstention in spite of the possibility that First Amendment rights may have to wait for their vindication. In this regard, the court notes that abstention may allow plaintiffs to prevail without having to navigate in untested constitutional waters.

In accordance with *Pullman, supra,* the court will stay review of the claims presented by plaintiffs pending the outcome of proceedings in the state courts in this matter. Should plaintiffs wish to reserve their right to have the federal issues heard before this court pursuant to *England, supra,* they should so indicate to this court and the state court within thirty days of the entry of this decision.

### III. Motions for Preliminary Relief

#### a. Collateral Estoppel and Res Judicata

Objections are raised to plaintiffs' motions for preliminary injunctive relief on grounds of res judicata and collateral estoppel. Defendants contend that the New Jersey Supreme Court recently decided the same issues now presented to this court when it dissolved a stay of the Commission's orders secured by the individual plaintiffs before the Superior Court Appellate Division. The order of the State Supreme Court was not accompanied by an opinion. While the briefs of the parties before that court outlined the issues for review, this court has no way of knowing the actual basis of the decision dissolving the stay.

 In the federal courts it is settled that a prior judgment will not have a res judicata or collateral estoppel effect as to any issue not essential to the judgment. *Stebbins v. Keystone Insurance Co.,* 481 F.2d 501, 506 (D.C.Cir.1973); *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1168 (5th Cir.1981). Furthermore, "[i]f the basis for the first judgment is uncertain, then no estoppel is created as to any of the issues, even though they were actually litigated." *Stebbins, supra,* 481 F.2d at 507, n. 13. Because the exact grounds for the State Supreme Court ruling are impossible to discern, it is also impossible to determine what issues if any were "essential to the judgment." Accordingly, the court is unable to treat the decision as controlling or even persuasive on any of the issues presented by the instant motions.

#### b. Standard for Issuance of Preliminary Relief

 In order to obtain preliminary injunctive relief in this Circuit, the moving party must show that it has a reasonable

probability of success in the litigation and that it will be irreparably harmed pendente lite if the preliminary injunction is not granted. The trial court may also consider the possibility of harm to other interested parties from the grant or denial of injunctive relief as well as the degree to which the public interest will be served by the award of injunctive relief. *Spartacus, Inc. v. Borough of McKees Rocks*, 694 F.2d 947, 949 (3rd Cir.1982); *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3rd Cir.1982), and cases cited therein. The grant or denial of preliminary injunctive relief is within the sound discretion of a district judge. As none of the four factors relevant to a motion for preliminary injunctive relief is determinative, a balancing of all elements is required. *Spartacus, Inc., supra*, 694 F.2d at 949; *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories*, 630 F.2d 120, 136 (3rd Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The court will now consider the plaintiffs' claims in light of these standards.

### c. Factors Relevant to the Motions for Preliminary Relief

### 1. Reasonable Probability of Succession on the Merits

The court's prior decision in this case found the Union unlikely to prevail on claims that sections 93 and 86 of the Act are overbroad restrictions on associational rights and unconstitutionally vague on their face. 536 F.Supp. at 335–38. In this action, plaintiffs assert that the Act is unconstitutional as applied, on similar grounds.

#### (a) Freedom of Association Claim

■ The constitution protects the freedom to associate as a right peripheral to and supportive of the exercise of other rights guaranteed by the First Amendment. *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965); *NAACP v. Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). Rights of association have been recognized in connection with social and economic purposes as well as political goals. *Griswold, supra.*

The Commission has ordered the removal of Gerace and Materio on the basis of interactions between the individual plaintiffs and persons connected with organized crime. This court must determine whether the First Amendment prohibits the regulation of the associations on which the Commission based its sanctions against Gerace and Materio. Prior to answering that question, the court must consider the nature of the associations in question.

Sharp disagreement exists as to the grounds for the Commission's actions concerning Gerace and Materio. Plaintiffs argue that the two officers are being penalized for "mere associations" of a social nature with Nicodemo Scarfo and his associates. Scarfo is widely reputed to head organized crime activities in the Philadelphia-South Jersey area. According to plaintiffs, they may not be punished for social contacts absent proof of their "knowing participation ... in unlawful conduct or ... specific intent on their part to further the illicit goals" of their associates. Union's Brief in Support of Order to Show Cause and Motion for Preliminary Injunction at 16–17.

The court finds that the Commission's decisions to disqualify and remove the individual plaintiffs is grounded on evidence suggestive of more than innocent social contacts and less than knowing involvement in criminal acts. The Commission has documented extensive circumstantial evidence indicating that Scarfo "exercises influence over Gerace and Materio in the conduct of union affairs." The Commission has stressed that under Gerace and Materio a series of appointments have been made to Union positions of "persons associated with Scarfo" and that extensive business arrangements have been established between the Union and "firms with ties to Scarfo." The Commission found no direct evidence of wrongdoing by Gerace and Materio or of Scarfo's direct involvement in union affairs. Commission's Decision of September 28, 1982 at 49, Order to Show

Cause, Exhibit 5. Regarding the evidence of Scarfo's influence on the Union and Scarfo's contacts with the individual plaintiff's, the Commission stated that

> we need not wait for its detrimental effect on the Union and ultimately on the casino industry to become manifest before we can act. The *fact of influence* by a person such as Scarfo is inimical to the policy of the Act and gaming operations.

*Id.* at 49–50 (emphasis added). On this motion for preliminary relief, strict scrutiny of the Commission's findings is inappropriate. The court believes that such conclusions are supported by sufficient credible evidence. Further review of the evidentiary basis of the Commission's order is properly conducted by the New Jersey appellate courts in connection with this court's decision to abstain under *Pullman, supra.*

The associational rights asserted by plaintiffs are conceded to have no underlying political purposes. Furthermore, the Commission has determined, based on an extensive record, that the interactions between plaintiffs and Scarfo are not innocent. On the contrary, these relationships have been held to affect Union activity and policy. Such influence is considered likely to undermine public confidence in the casino industry and to portend more serious consequences in the future.

Consequently, plaintiffs may not rely on the cases condemning statutes which penalized associations with political groups without guaranteeing individualized determination of the innocence of such relationships. *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). Moreover, the fact that the statute in question in this case does not impose criminal sanctions or infringe on political activity, as in *Robel* and *Elfbrandt,* also suggests that the standard of proof required in those cases, specific intent or actual involvement, is also inappropriate in this case.

Where federal courts have reviewed statutes inhibiting non-political interaction, the innocence of the social purposes in such associations has been crucial to the outcome. For instance, freedom of association unrelated to the advancement of common beliefs has been upheld where plaintiffs incurred penalties solely by virtue of association with their children. *Tyson v. New York City Housing Authority,* 369 F.Supp. 513 (S.D.N.Y.1974). Innocent interaction with criminals has been considered constitutionally protected in several instances. Each of these cases involved circumstances distinguishable from the case at bar. Two of these cases concerned overbroad or facially vague statutes. *Aladdin's Castle, Inc. v. City of Mesquite,* 630 F.2d 1029, 1038 (5th Cir.1980) (ordinance barring license to operate amusement machines for persons having "connections with criminal elements" held void for vagueness because "the nature of the improper associations or acquaintances is unspecified"); *Sawyer v. Sandstrom,* 615 F.2d 311, 316 (5th Cir.1980) (loitering ordinance penalizing presence with others in places where narcotics are being "used or possessed" held overbroad because it "criminalizes ordinary associational conduct"). Such cases differ from this one because of the court's previous finding that sections 93 and 86 are not overbroad or facially vague.

In another case, heavily relied on by plaintiffs, *Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.1984), the court granted relief to a policeman fired for dating the daughter of a reputed mobster. Unlike this case, the ousted officer in *Wilson* faced no significant evidence of acting under the influence of an organized crime leader. The Fifth Circuit specifically suggested that the officer could have been fairly terminated for more extensive involvement with "certain felons, indicted individuals, suspects or their relatives." 733 F.2d at 1545, n. 3.

The legitimacy of state regulation of non-innocent interaction with criminals by persons involved in legal gaming operations was considered in *Lewitus v. Colwell,* 479 F.Supp. 439 (D.Md.1979). The *Lewitus*

court upheld a state agency order prohibiting a racehorse owner from entering a race because of his involvement, partly social and partly business-related, with a person formerly implicated in numerous illegal racetrack betting schemes. The court's rationale reflected a narrow reading of the scope of protected association under the First Amendment. However, in light of the factual findings in *Lewitus* supporting an inference of illegal influence, the outcome appears valid under the broader view this court takes of the First Amendment.

Although the case law is somewhat unsettled on the freedom of association issue presented by plaintiffs, the court believes their position is unlikely to succeed. The Commission's findings indicate organized crime influence on the Union related to the individual plaintiffs. Relevant federal cases suggest that such non-innocent association with criminals may not be afforded protection under the First Amendment.

#### (b) Vagueness Claim

This court has previously held that section 86(f) is not vague on its face because it incorporates an objective standard regarding conduct likely to be found "inimical" to the casino industry. 536 F.Supp. at 337. The court is now urged to find section 86(f) vague as applied. The individual plaintiffs assert that they had no reason to believe they would be disqualified from their union posts because of their contacts with Nicodemo Scarfo prior to his designation as a "career criminal" by the Commission in 1982.

In its 1982 proceedings, the Commission documented the prominence of Scarfo in alleged and proven criminal activities and the evidence of his influence on the selection of Local 54's staff and its choice of business associates. These findings belie plaintiffs' claims that they did not have a "reasonable opportunity to know what was prohibited" or that they have been subjected to "arbitrary and discriminatory enforcement." *Village of Hoffman Estates v. Flipside, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

Accordingly, the court finds that plaintiffs are unlikely to succeed on their claim that the Act is vague as applied to them.

#### 2. Irreparable Harm

On the issue of irreparable harm, the court has considered the parties' briefs as well as the live testimony of Frank Gerace and Frank Materio. In evaluating the injuries likely to result from the granting of preliminary relief, the court must weigh separately evidence of harm to the Union and to the individual plaintiffs.

If Gerace and Materio are forced to vacate their Union posts, the major source of injury to the Union will be the disruption of Union activities. According to the Union, the members of Local 54 would also suffer infringement of their right to choose labor representatives free from unconstitutional state regulation as well as "per se irreparable harm" stemming from the Commission's violations of their First Amendment rights. The latter two elements of alleged injury are predicated on a finding that plaintiffs' constitutional claims are probably valid, a position rejected by the court in the previous section. The court finds equally unpersuasive individual plaintiffs' claim that they will suffer "per se" harm due to alleged violations of their First Amendment rights if preliminary relief is denied. Gerace and Materio also assert that they will personally suffer irreparable harm because of the loss of their jobs, the likelihood that they will not be reinstated in their union posts and the possibility of damage to their reputations.

The court is told that Gerace and Materio are so critical to the functioning of Local 54 that their departure would seriously undermine "critical collective bargaining activities" and other internal Union functions. Gerace testified that he is the sole person thoroughly informed as to the Union's bargaining agreements and that there are no other members of the Union capable of taking over his duties at this time. Mr. Gerace's testimony also showed that he has directed the Union for over ten years, that he is responsible for administration of the

Union grievance procedures and that he serves as an officer of several union trust funds and other labor organizations. On the stand, Gerace explained that if he is removed, the Union would probably be denied his leadership for more than three years, as he may be unable to run for reelection as Union President in July 1985.

According to the testimony of Materio, he has worked for six years as a business agent for the Union. His duties are to serve the needs of roughly 1100 non-casino Union members, chiefly in such matters as grievance adjustment.

Cross-examination of the witnesses revealed that both individual officers are less essential than plaintiffs maintain. Materio is one of a dozen business agents, several of whom have been replaced over the last several years, with only a temporary, modest effect on the efficiency of Union operations. (Testimony Transcript, at 15–16, 32–33). Gerace's testimony indicates that the removal of Materio would have a similar impact. (T.T. at 14–15). Surely the removal of Materio, who is concededly not a policy-making officer of the Union, would not produce irreparable or even substantial harm to the overall health of the Union.

As for Gerace, the court has heard ample evidence that there are several officers of the Union and members of the Union Executive Board who are knowledgeable, albeit less so than Mr. Gerace, as to the operations of the Union and the content of its collective bargaining agreement. Some of these individuals have been in positions of significant responsibility for several years and appear to be capable of handling major Union management duties in the event of Gerace's removal. (T.T. at 16–21, 24). Although the Union's effectiveness might suffer for a while if Gerace leaves his post, such harm would not be irreparable, nor would it necessarily be permanent, according to the evidence received by the court.

Plaintiffs' claims that Gerace is the only one who can competently run the Union are implausible. Such statements belie the fact that Gerace has recently delegated some of his authority over contract negoti-

ations to the Vice President of the Union. (T.T. at 17–18). Plaintiffs' position also ignores the fact that the Union could be forced to manage without Gerace for any number of reasons in the near future. Gerace could be voted out of office in the next election; he might also become incapacitated by ill-health or by an adverse verdict in a pending criminal prosecution against him. Finally, the court notes that there is no reason to believe that this court's refusal to grant preliminary injunctive relief inevitably cheats the Union of Gerace as a candidate for reelection in July 1985. Should the plaintiffs prevail on the merits at any later stage in this case, another court is free to issue a stay of the Commission's orders. It is also possible that this case could be resolved by July 1985.

The court finds even less persuasive the individual plaintiffs' claims that they will suffer irreparable harm absent issuance of a preliminary injunction. Gerace and Materio's assertions that they have few employment options if they lose their present jobs do not seem convincing, as they have other job skills and long records of previous employment. Both men can hope to benefit from numerous professional contacts with potential employers arising out of their positions in the Union. There is also little to the allegation that the individual plaintiffs face serious damage to their reputations if they are forced to resign. Both men have been living under the cloud of the Commission's disqualification order for over two years. Until their claims against those orders are resolved, they can look forward to continuing and substantial injury to their reputations regardless of whether they are allowed to stay in their present jobs. As was discussed above, both men's claims that they are unlikely to be able to serve the Union again in the near future once they are removed is speculative.

Finally, the officers' claims that they will suffer financial injury are not alone sufficient to establish irreparable harm. In *Oburn v. Shapp*, 521 F.2d 142 (3rd Cir. 1975), the court denied a motion for a pre-

liminary injunction based on claims of financial injury due to government action denying plaintiffs employment. According to that court, the fact that "such losses may be remedied by appropriate judicial decrees if plaintiffs should prove successful" in the litigation "weighs heavily against a claim of irreparable harm." 521 F.2d at 151.

### 3. Public Interest

In this case, the questions of potential harm to "other interested parties" and to the public interest amount to the same inquiry. Plaintiffs urge the court to consider possible infringement of First Amendment rights resulting from denial of preliminary relief as a detriment to the public interest. In response to defendants' claims that delayed enforcement of the Commission's orders is undesirable, plaintiffs argue that the public is disserved by implementation of state agency rulings tainted by accusations of constitutional invalidity. It is further asserted that an injunction would have no effect on most state activity concerned with regulation of casino gambling or with prosecution of organized crime.

The court is concerned by the fact that Commission action directed at the plaintiffs has been enjoined for over two years. Presently before the court is the question of whether to extend the period of relief to accommodate a second round of litigation. On the basis of the submissions and arguments of the parties, the record in this case and the history of state efforts to regulate casino gambling, the court is unable to conclude that the public will only suffer minimal injury from a grant of preliminary relief. To the contrary, the court is persuaded that the weight of the evidence clearly suggests that the public interest will be benefited by denial of the motion for a preliminary injunction.

The disqualification of the individual plaintiffs involves a good faith response to well-documented dangers of organized crime influence in the casino industry. Public concern about this threat is intense,

and legitimately so. In prior proceedings, this court determined that continued popular support for casino gambling is founded on confidence in the integrity of the strict regulatory scheme set forth in the Casino Control Act. 536 F.Supp. at 321–24. Consequently, it is fair to assume that postponed enforcement of the Commission's orders has a serious negative effect on public faith in effective regulation of the casino industry. The prominence of this controversy renders irrelevant the claim that an injunction will leave in effect other state enforcement mechanisms.

In view of the above discussion concerning plaintiffs' First Amendment claims, the court is convinced that there exists little if any public injury attributable to possible denial of First Amendment rights. It is also unlikely that any substantial harm arises from the enforcement of Commission orders claimed to be invalid. After all, the Supreme Court has already declared Commission disqualification proceedings to be a legitimate exercise of state power.

### 4. Weighing of the Relevant Factors

Plaintiffs have failed to satisfy their burden to show either that they are likely to succeed in this litigation or that they will suffer irreparable harm in the absence of preliminary injunctive relief. In addition, the record suggests that the public interest will be served to a greater extent by the denial of relief pendente lite than by a further stay of the Commission's orders disqualifying the individual plaintiffs and directing them to vacate their union posts. A weighing of relevant factors leads the court to conclude that plaintiffs are not entitled to issuance of a preliminary injunction. Plaintiffs' motion for such relief is denied.

### IV. Conclusion

The motion to intervene by the individual plaintiffs is granted as to Frank Gerace and Frank Materio with respect to their claims that section 86(f) of the Casino Control Act is unconstitutional as applied. The motion to intervene is denied as to Karlos LaSane.

Plaintiffs' motion for preliminary injunctive relief is denied.

In accordance with its analysis above, the court finds that the *Pullman* doctrine applies to this case. Consequently, the court will stay further proceedings pending the outcome of ongoing litigation in the courts of the State of New Jersey on all outstanding issues of state law. If plaintiffs wish to reserve the right to have their federal constitutional claims decided before this court, they should inform this court and the state court of their desire to do so.

An appropriate order will be entered incorporating all aspects of the court's decision.